T.C. Memo. 2014-37

UNITED STATES TAX COURT

TROY N. DALLA AND MARIETA DALLA, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2026-12L.                        Filed March 6, 2014.

<u>Robert D. Grossman, Jr.,</u> and <u>Derek N. Hatch</u>, for petitioners.

<u>Fred Edward Green, Jr.</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  This case was commenced in response to a notice of
determination concerning collection action(s) under section 6320 and/or 6330 that
sustained a proposed levy to collect petitioners' unpaid Federal income tax
liability for 2008.  The issue for decision is whether the determination of the

[*2] settlement officer to deny "currently not collectible" status (CNC status) and sustain a proposed levy was an abuse of discretion. All section references are to the Internal Revenue Code in effect at all relevant times.

FINDINGS OF FACT

All of the material facts are contained in the administrative record of the exchanges between petitioners and their counsel, and the Internal Revenue Service (IRS) Office of Appeals (Appeals Office). That record has been stipulated. The stipulated facts are incorporated in this opinion by this reference. Petitioners resided in Nevada when they filed their petition.

On May 17, 2010, the IRS sent to petitioners a Letter 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice), with respect to their reported but unpaid income tax liability for 2008. As of the date of the levy notice, the assessed account balance, with interest and penalties, for 2008 was $15,256.78.

In response to the levy notice, petitioners filed Form 12153, Request for a Collection Due Process or Equivalent Hearing (request for a section 6330 hearing), dated May 24, 2010. In their request for a section 6330 hearing, petitioners disputed their underlying tax liability for 2008, stated that they could not pay the liability, suggested alternatives of an installment agreement or an

[*3] offer-in-compromise, and requested a face-to-face conference with the Appeals Office. The Appeals Office sent a letter dated October 27, 2010, requesting that petitioners provide a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, along with substantiating documentation. On November 8, 2010, petitioners provided Form 433-A, which stated that they had total monthly income of $4,945 and total monthly expenses of $6,329.

An Appeals Office settlement officer sent to petitioners a letter dated August 1, 2011, scheduling a face-to-face conference in response to their request for a section 6330 hearing. The letter requested that petitioners send to the Appeals Office, by August 17, 2011, the following items: (1) a current Form 433-A; (2) a signed 2010 tax return; and (3) proof of estimated tax payments for 2011.

Petitioners' counsel and the settlement officer met for the section 6330 hearing on August 24, 2011. Petitioners provided an updated Form 433-A and additional documentation to substantiate the reported information. The updated Form 433-A showed total monthly income of $5,137 and total monthly living expenses of $6,099. Petitioners also provided evidence of an estimated tax payment for 2011 of $3,500.

**[\*4]**   At the hearing, petitioners indicated that they were no longer contesting the underlying tax liability and were no longer considering an installment agreement or an offer-in-compromise.  Instead, petitioners believed their account should be placed in CNC status.  The settlement officer again requested the 2010 return.

By fax and with a letter dated August 31, 2011, petitioners submitted to the settlement officer a copy of their 2010 Form 1040, U.S. Individual Income Tax Return.  The return reported tax due of $17,766.24.  The settlement officer reviewed petitioners' updated Form 433-A, along with the 2010 return and all other provided documentation, and determined that petitioners had the ability to make monthly payments of $652.  In reaching this determination, the settlement officer calculated petitioners' monthly income of $6,241 by averaging their net business income over the prior three years and calculated their monthly expenses of $5,589 by applying the national and local standards used by the IRS.  The settlement officer allowed petitioners $276 for vehicle operating costs--the maximum allowable amount under those standards.  In a fax dated September 27, 2011, the settlement officer conveyed to petitioners her finding that their account would not qualify for CNC status because they had the ability to make monthly payments.  The letter then instructed petitioners to contact her by October 5, 2011, so that the parties could decide how to proceed.

[*5]  In a letter dated October 4, 2011, petitioners asserted that they had automobile expenses of $876 instead of the $600 they had reported on Form 433-A.  Petitioners also commented that the settlement officer's analysis of their monthly income was excessive compared to the reality of their actual income in 2011.  Petitioners asserted that their current income should be used to calculate their ability to pay.

The settlement officer called petitioners' counsel to discuss their issue with the income.  Petitioners' counsel stated that petitioners' income had decreased, and the parties agreed that petitioners would provide a current profit and loss statement for 2011 with additional substantiating documentation. The settlement officer also questioned a currency transaction report (CTR) that she had discovered in petitioners' previously provided information.  The settlement officer requested that petitioners provide an explanation of the CTR, which reflected a cash withdrawal by Marieta Dalla (petitioner) of $120,000 on February 10, 2010.

On October 26, 2011, the settlement officer received from petitioners a 2011 income statement and a statement explaining that the $120,000 cash belonged to petitioner's mother and had been originally placed in petitioner's bank account because the mother was in poor health.  The income statement for January 1 through October 31, 2011, reported that petitioners had received income totaling

[*6] $69,000 and expected an additional $10,000 before yearend, for a total of $79,000 of income in 2011.  This income would be offset by $9,000 of estimated business expenses for a net of $70,000, or approximately $5,833 of monthly income.

The settlement officer reviewed petitioners' 2011 income statement and their updated Form 433-A and supporting documentation.  She also checked petitioners' bank records for all deposits made in 2011 through October and determined gross deposits of $85,272.  Using $85,272 as petitioners' income to date, she added the $10,000 of estimated gross income for the remainder of 2011, and then subtracted the $9,000 of estimated business expenses, reaching an erroneous total of $76,272, or $6,356 of total monthly income.  She then calculated petitioners' monthly expenses to be $5,495 after adjustments, including vehicle operating expenses of $472 for two cars in accordance with local standards.  She recognized that petitioners also claimed vehicle expenses among their business expenses reported on Schedule C, Profit or Loss From Business.  Her final analysis left petitioners with an ability to make monthly tax payments of $861.

The settlement officer considered variations of petitioners' economic situation, and she prepared alternative monthly income/expense analyses of these

[*7] variations. In one variation, she included petitioner's mother in petitioners' household and considered the $120,000 withdrawal towards petitioners' ability to pay fully their tax liability. However, in each analysis, petitioners had surplus income after expenses, and in no analysis was the $120,000 included as income.

To clarify some of the provided information, including questions as to the $120,000, the settlement officer held a telephone conference with petitioners' counsel on November 7, 2011, as part of the section 6330 hearing. During this conference, the settlement officer advised that even if the $120,000 cash was not petitioners', they would still fail to meet the criteria for CNC status according to her most recent analyses. She also stated that even if the $120,000 belonged to petitioner's mother, it would still be considered in the analysis of petitioners' ability to pay their liability. The settlement officer requested additional documentation and gave petitioners until November 14, 2011, to provide it.

On November 16, 2011, the settlement officer received the requested additional documentation. Petitioners later provided notarized affidavits regarding the $120,000 withdrawal. In the affidavits, petitioners attested that petitioner's mother was 79 years old and had moved from Romania to the United States so that they could care for her. The mother had brought certain retirement moneys from Romania that were deposited into petitioner's bank account for safekeeping.

[*8] When her health was failing her in 2010, petitioner's mother asked petitioner to withdraw the moneys so that they would not become tied up in probate if she died. Petitioners attested that they never used the mother's moneys to pay any personal or business expenses for themselves, that they had no control over or possession of the $120,000 withdrawn, and that they had not benefited from the $120,000.

The settlement officer opined that the affidavits did not substantiate that the $120,000 belonged to petitioner's mother. She determined that petitioners were able to pay fully their 2008 tax liability. She determined that petitioners were ineligible to have their account placed in CNC status. On December 5, 2011, the settlement officer held a final conference and advised petitioners' counsel of her determinations.

The settlement officer verified that the requirements of all applicable laws and administrative procedures had been met. On December 19, 2011, the Appeals Office sent to each petitioner a Notice of Determination Concerning Collection Actions(s) Under Section 6320 and/or 6330 sustaining the proposed levy.

OPINION

Section 6330 provides for notice and an opportunity for a hearing before a levy proposed by the IRS to collect unpaid taxes may proceed. Under section

**[*9]** 6330(c)(2)(A), a taxpayer may raise any relevant issue at a hearing, including "challenges to the appropriateness of collection actions", and may make "offers of collection alternatives, which may include the posting of a bond, the substitution of other assets, an installment agreement, or an offer-in-compromise." A request for CNC status is treated as a collection alternative. See, e.g., Hinerfeld v. Commissioner, 139 T.C. 277, 290 (2012). A taxpayer is expected to provide all relevant information requested by the Appeals Office for its consideration of the facts and issues involved in the hearing. See sec. 301.6330-1(e)(1), Proced. & Admin. Regs. Such information is especially necessary when the proposed collection alternative is to have collection suspended on the grounds that the liabilities are currently not collectible. See Pitts v. Commissioner, T.C. Memo. 2010-101, slip op. at 18. Where there is no dispute as to the underlying liabilities, we review the actions of the Appeals Office for abuse of discretion. See Swanson v. Commissioner, 121 T.C. 111, 119 (2003). Abuse of discretion may be found if action is arbitrary, capricious, or without sound basis in fact or law. Giamelli v. Commissioner, 129 T.C. 107, 111 (2007); Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

Petitioners have not disputed their underlying tax liability or that the Appeals Office performed the necessary verification under section 6330(c)(1). In

[*10] their petition and pretrial memorandum, petitioners raised an issue that the settlement officer did not consider an installment agreement; however, the record reflects that petitioners' counsel expressed to the settlement officer that petitioners sought no collection alternative other than having their account placed in CNC status. At trial, petitioners argued that the settlement officer had abused her discretion by including in her consideration the $120,000 cash and thereby determining that petitioners were able to pay fully their 2008 tax liability. Petitioners rely on their affidavits as proof that the $120,000 withdrawn from petitioner's bank account belonged to her mother. The affidavits are not improbable or contradicted, and we accept them at face value.

Respondent objected to certain exhibits that petitioners offered on the ground that they were not part of the administrative record. Respondent also objected (contrary to petitioners' assertions in their posttrial briefs) to petitioner's trial testimony. That testimony was treated as an offer of proof. For the reasons discussed below, we conclude that consideration of the testimony and additional arguments and exhibits offered by petitioners would not affect our conclusion and that respondent's objection, which we took under advisement, has been rendered moot.

[*11] A taxpayer may request that an outstanding Federal income tax liability be designated currently not collectible where, on the basis of the taxpayer's assets, equity, income, and expenses, the taxpayer has no apparent ability to make payments on the outstanding tax liability. See Foley v. Commissioner, T.C. Memo. 2007-242, slip op. at 6 (citing primarily Internal Revenue Manual (IRM) pt. 5.16.1.2.9 (Feb. 2006)); see also IRM pt. 5.16.1.2.9 (May 5, 2009). The Commissioner's internal procedures indicate that CNC status is determined by whether an imposed levy would create a hardship. IRM pt. 1.2.14.1.14(5) (Nov. 19, 1980). Thus a taxpayer must establish that a hardship exists, and he or she may do so by showing that "the levy action prevents the taxpayer from meeting necessary living expenses." Id.; accord Vinatieri v. Commissioner, 133 T.C. 392, 398 (2009); sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs.

The settlement officer made her final analysis of petitioners' monthly total income and expenses by reviewing all the information petitioners provided. Starting with gross deposits to determine income from January through October 2011, she concluded that petitioners had income of $85,272. To this amount she added the $10,000 of estimated gross income petitioners reported for November and December 2011 and then subtracted the $9,000 of estimated business expenses petitioners claimed. The settlement officer did not use the $120,000 in

[*12] calculating petitioners' income for 2011. In determining the total income, the settlement officer erred $10,000 in petitioners' favor by reaching a net of $76,272, or $6,356 of total monthly income. Having considered all factors, the settlement officer modified petitioners' monthly expenses to $5,495, which, when subtracted from monthly income, left petitioners with $861 per month of surplus income. Petitioners would be in a position to meet all their necessary living expenses.

The settlement officer also made alternative computations, one of which included petitioner's mother in petitioners' household. Under these alternatives, the $120,000 was again not included in monthly income (it was considered only as to whether petitioners could fully pay the tax liability where the mother's income and expenses were included). Under each analysis, the settlement officer determined that--without inclusion of the $120,000 cash--petitioners would have income greater than expenses. Though the settlement officer finally determined that petitioners had failed to prove that the $120,000 cash was not theirs, this determination did not affect her income and expense computations, each of which showed that petitioners were able to make monthly payments.

In their reply brief, petitioners advance an argument, which arose during the section 6330 hearing process, against the settlement officer's computation of their

[*13] monthly expenses.  Petitioners contend that the settlement officer failed to allow their combined total vehicle operating costs of $876.  However, with exceptions not shown to exist here, the Appeals Office applies the national and local standards limitations in computing expenses.

The Court has sustained the Commissioner's use of the IRS' published national and local allowances as guidelines for basic living expenses in evaluating the adequacy of proposed collection alternatives.  See Speltz v. Commissioner, 124 T.C. 165, 179 (2005), aff'd, 454 F.3d 782 (8th Cir. 2006); Aldridge v. Commissioner, T.C. Memo. 2009-276; Fernandez v. Commissioner, T.C. Memo. 2008-210.  The settlement officer appears to have permitted the maximum allowable amount of $472 for the operating costs of two cars in accordance with the local standards of petitioners' place of residence.  She permitted this allowance despite her reservations about petitioners' having claimed automobile expense deductions with respect to their Schedule C business.  In any event, we do not recalculate petitioners' ability to pay but decide only whether the Appeals settlement officer abused her discretion.  See Speltz v. Commissioner, 124 T.C. at 179-180; Aldridge v. Commissioner, T.C. Memo. 2009-276, slip op. at 16.

To summarize, petitioners sought only CNC status.  Under any income/expense analysis performed by the settlement officer, and regardless of the

**[*14]** $120,000 in dispute, petitioners have monthly income greater than monthly expenses. Petitioners failed to show that respondent's levy action would prevent them from meeting their necessary living expenses or otherwise cause them a hardship.

Respondent argues that the attribution of the $120,000 cash is immaterial to the resolution of this case. After careful review of the administrative record, we agree. We cannot conclude on that record that the settlement officer's determination was arbitrary or capricious or without foundation in fact or law. Thus we do not find that the determination was an abuse of discretion.

We have considered the other arguments of the parties. Some are contrary to the record. Others are not material to our decision.

To reflect the foregoing,

<u>An appropriate order and decision</u>

<u>for respondent will be entered</u>.